Scott Wilbur COLEGROVE, Plaintiff,

v.

Carolyn W. COLVIN, Acting
Commissioner of Social
Security, Defendant.

No. 13–CV–6666 EAW.

United States District Court,
W.D. New York.

Signed Feb. 13, 2015.

Howard D. Olinsky, Olinsky Law Group, Syracuse, NY, for Plaintiff.

Joanne Jackson, Peter William Jewett, Social Security Administration, New York, NY, Kathryn L. Smith, U.S. Attorney's Office, Rochester, NY, for Defendant.

## DECISION AND ORDER

ELIZABETH A. WOLFORD, District Judge.

## I. INTRODUCTION

Plaintiff Scott Wilbur Colegrove ("Plaintiff") brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) seeking review of the final decision of Carolyn W. Colvin, Acting Commissioner of Social Security ("the Commissioner"), denying Plaintiff's application for disability insurance benefits. (Dkt. 1). Plaintiff alleges that the decision of Administrative Law Judge ("ALJ") John P. Costello was not supported by substantial evidence in the record and was based on erroneous legal standards.

Presently before the Court are the parties' opposing motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (Dkt. 7, 10). For the reasons set forth below, the Commissioner's motion for judgment on the pleadings (Dkt. 10) is denied, Plaintiff's motion (Dkt. 7) is granted in part, and this matter is remanded for further administrative proceedings.

## II. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A. Overview

On January 19, 2011, Plaintiff protectively filed an application for disability insurance benefits. (Administrative Transcript (hereinafter "Tr.") 126). In his application, Plaintiff alleged a disability onset date of March 1, 2006. (*Id.*). Plaintiff alleged the following disabilities: epilepsy, a back condition, and depression. (Tr. 146). On April 28, 2011, the Commissioner denied Plaintiff's application. (Tr. 77).

On March 20, 2012, Plaintiff, represented by counsel, testified at a hearing before ALJ Costello. (Tr. 24–50). Vocational Expert ("VE") Peter Manzi also appeared and testified. (Tr. 52–58). On April 24, 2012, the ALJ issued a finding that Plaintiff was not disabled within the meaning of the Social Security Act. (Tr. 10–18).

On October 24, 2013, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1–4). On December 20, 2013, Plaintiff filed this civil action appealing the final decision of the Commissioner. (Dkt. 1).

### B. The Non–Medical Evidence

Plaintiff was 39 years old on the date of his application. (Tr. 12, 126). Plaintiff has a twelfth grade education and vocational training in heavy equipment operation. (Tr. 147). Plaintiff had previous work experience as a contracted laborer. (*Id.*).

#### 1. Plaintiff's Testimony

Plaintiff testified that he could not remember much of his past work. (Tr. 31–32). Plaintiff last worked part-time as a firefighter in Georgia. (Tr. 29–30). Plaintiff reported that his epilepsy was his most serious condition. (Tr. 36). He had a seizure in March of 2006 that placed him in the hospital in a medically-induced coma. (Tr. 33). He experienced memory loss as a result of his epilepsy. (Tr. 37). Plaintiff indicated that he had difficulty remembering instructions. (*Id.*). Plaintiff testified that he also had difficulty with reading comprehension. (Tr. 38). Plaintiff enjoyed hunting and fishing. (Tr. 43).

Plaintiff testified that he had knee pain, and that walking and sitting hurt his knees. (Tr. 39–40). He also had back pain. (Tr. 40). Plaintiff stated that he could sit for approximately one-half hour at a time because of this pain. (*Id.*). Plaintiff had trouble sleeping and was awake for most of the night. (Tr. 41). He got up to put his daughter on the bus and would sleep until the early afternoon when his daughter got off the bus. (*Id.*). He indicated that his pain medications helped, but did not completely alleviate his pain. (*Id.*).

#### 2. Vocational Expert's Testimony

At the hearing, the ALJ presented the VE with a series of hypothetical questions. (Tr. 46–49). First, the VE was asked to consider someone of Plaintiff's age, education, and work experience who could perform work at a medium exertional level who was limited by needing to avoid heights, heavy machinery, and driving, and was limited to simple tasks. (Tr. 47). The VE opined that such a person could not perform Plaintiff's past relevant work, but could perform the job of a cafeteria attendant, which was light in exertion and unskilled. (Tr. 48).

The ALJ then presented a second hypothetical question that limited the hypothetical individual to light work with the same additional restrictions. (*Id.*). The VE stated that such an individual could perforin the work of a cafeteria attendant or

collator operator, both light and unskilled positions. (*Id.*).

In a third hypothetical, the ALJ imposed an additional restriction of a need for a supervisor to remind the individual of tasks once per hour. (*Id.*). The VE opined that such an individual could not maintain employment. (*Id.*).

The ALJ then asked if the individual from the first hypothetical could maintain gainful employment if he was off task approximately 20% of the time. (*Id.*). The VE stated that such an individual could not maintain gainful employment. (*Id.*).

### C. Summary of the Medical Evidence

The Court assumes the parties' familiarity with the medical record, which is summarized below.

On June 20, 2005, Plaintiff was admitted to the Baroness Erlanger Emergency Department following a motor vehicle collision. (Tr. 233). Plaintiff's vehicle had struck a telephone pole, and bystanders reported finding Plaintiff "having a seizure." (*Id.*). The EMS reported that Plaintiff was "post-ictal at scene." (*Id.*). Plaintiff had a seizure despite taking Depakote. (*Id.*).

On March 20, 2006, David C. Bosshardt, M.D., from Hutcheson Emergency Department in Oglethorp, Georgia, noted that on March 3, 2006, Plaintiff was brought into the department unconscious after being found slumped over the front seat of a fire truck. (Tr. 240). Plaintiff was a firefighter and was about to respond to a fire call when he was found in the vehicle by another firefighter. (Tr. 277). Plaintiff was treated in the intensive care unit for "intense treatment of seizures." (Tr. 240). Plaintiff was discharged on March 20, 2006, with restrictions that he not drive for one year and that he would need assistance with transfers and ambulation. (Tr. 241).

On December 15, 2006, Plaintiff treated with Thomas Walters, M.D., at Tri–County Family Medicine, reporting palpitations, depression, and a seizure disorder. (Tr. 400).

On January 8, 2007, Dr. Walters noted that x-rays of Plaintiff's spine revealed a slight, approximately 15% compression of a mid-thoracic vertebral body. (Tr. 399).

On January 22, 2007, Plaintiff reported increased back pain. (Tr. 398).

On January 30, 2007, Dr. Walters assessed Plaintiff with sleep apnea. (Tr. 397).

Following a DEXA scan of Plaintiff's back, Dr. Walters noted on February 19, 2007, that Plaintiff had osteopenia. (Tr. 333, 396).

Plaintiff treated with Dr. Walters on April 24, 2007, complaining of worsening back pain. (Tr. 394). Dr. Walters noted that an MRI showed bulging discs in Plaintiff's lumbosacral spine, but no nerve compression. (*Id.*). Dr. Walters diagnosed Plaintiff with "myofascial pain with the parapspinous muscles of the low back. Mild-to-moderate contribution from degenerative disc disease." (*Id.*). Plaintiff was prescribed Vicodin and physical therapy. (*Id.*).

On April 26, 2007, Joseph Mann, M.D., noted that Plaintiff had not had a seizure in approximately one year. (Tr. 461). Plaintiff's neurological exam was normal, and Dr. Mann recommended that Plaintiff see VESID for vocational training. (*Id.*).

On June 21, 2007, Dr. Walters wrote Plaintiff a prescription for physical therapy and noted that Plaintiff was recently discharged from his physical therapist due to noncompliance. (Tr. 392).

Dr. Walters examined Plaintiff on July 17, 2007, and noted that Plaintiff had intermittent back pain and numbness but had normal strength in his lower extremities. (*Id.*). Dr. Walters indicated that Plaintiff had been unsuccessful in his attempts to get disability benefits, and "released him to return to work without restrictions." (*Id.*).

On September 14, 2007, Dr. Azzam Alkhudari treated Plaintiff for chronic low back pain. (Tr. 466). Dr. Alkhudari examined Plaintiff and noted a decreased range of motion in his lumbar spine, although Plaintiff's gait was normal and his muscle strength was full in the lower extremities. (Tr. 467).

Dr. Alkhudari performed right lumbar facet joint steroidal injections at L2, L3, L4, and L5 on October 11, 2007. (Tr. 465). Dr. Alkhudari administered additional injections on December 7, 2007. (Tr. 457). On January 28, 2008, Dr. Alkhudari performed branch blocks on L3, L4, and L5. (Tr. 455).

On January 29, 2008, Plaintiff again treated with Dr. Walters for back pain, seizures, and depression. (Tr. 385). Plaintiff reported worsening depression and that he was not allowed to work as a volunteer firefighter in Livingston County due to interactions with the county coordinator. (*Id.*). Plaintiff stated that he wished he had passed away after his "myocardial infarction in Georgia." (*Id.*). Dr. Walters found that Plaintiff presented with a flattened affect. (*Id.*).

On February 15, 2008, Plaintiff was treated by Dr. Alkhudari. (Tr. 454). Plaintiff had a normal gait and could flex his lumbar spine to 90 degrees and extend to 20 degrees. (*Id.*). An MRI showed no significant findings, although Plaintiff reported no lasting pain relief with the injections. (*Id.*).

On February 26, 2008, Plaintiff visited Dr. Walters complaining of back pain and depression. (Tr. 383). Plaintiff also reported bilateral knee pain. (*Id.*). Dr. Walters told Plaintiff to continue taking Kadian for his back pain and Vicodin for breakthrough pain. (*Id.*). Dr. Walters increased Plaintiff's dose of Paxil to treat Plaintiff's depression. (*Id.*).

On March 13, 2008, Plaintiff treated with Dr. Steven Posnick for bilateral knee pain. (Tr. 453). X-rays showed a small effusion of the right knee, but no significant arthritis. (*Id.*). Dr. Posnick diagnosed bilateral patellofemoral syndrome, greater in the right than the left knee. (*Id.*).

On March 17, 2008, Plaintiff treated with Jill W. Miller, M.D., a neurologist at the University of Rochester Medical Center, who noted that Plaintiff had a seizure in January after she failed to call in a prescription. (Tr. 451). Plaintiff's motor, sensory, and coordination tests were normal. (Tr. 452). Dr. Miller encouraged Plaintiff to pursue VESID training and return to work. (*Id.*).

Plaintiff treated with Dr. Walters on March 25, 2008, and reported withdrawal symptoms including tremors and shaking in the afternoon when his Kadian wore off. (Tr. 381).

On March 31, 2008, Dr. Walters treated Plaintiff following a seizure on March 30, 2008. (Tr. 380). Plaintiff stated that he had not taken Kadian or hydrocodone since his seizure. (*Id.*). Dr. Walters examined Plaintiff and noted that Plaintiff had a resting tremor, appeared clammy, and had a bruise on his left forearm from when he fell from his seizure. (*Id.*). Dr. Walters diagnosed Plaintiff with a seizure disorder, chronic low back pain, and depression, and advised Plaintiff to split his Kadian dosage in half to avoid withdrawal symptoms. (*Id.*).

In a letter to the Social Security Administration dated April 3, 2008, Dr. Walters indicated that Plaintiff had the following medical issues: (1) "seizure disorder and he is currently actively having seizures approximately one time per month;" (2) "vertebral compression fracture in his mid-thoracic spine;" (3) osteopenia; (4) degenerative disc disease; (5) chronic bilateral knee pain; and (6) depression. (Tr. 441). Dr. Walters noted that Plaintiff had a L4–L5 disc bulge and had tried injections at a pain clinic as well as physical therapy. (*Id.*). Dr. Walters further noted that Plaintiff "spent most of his employment career doing physical labor and working as a firefighter. Because of his back problems, it is no longer appropriate for him to do this kind of employment." (*Id.*). Dr. Walters opined: "I believe his combination of chronic low back pain with degenerative disc disease and his seizure disorder makes it impractical for him to find and maintain employment." (*Id.*).

On April 8, 2008, Plaintiff's father accompanied Plaintiff to an appointment with Dr. Walters. (Tr. 378). Plaintiff was experiencing delirium and had not been taking his Percocet or Kadian. (*Id.*). Plaintiff was taking Depakote and Ambien. (*Id.*). On examination, Dr. Walters noted that Plaintiff had a tremor with his hands extended, acted like a child, and had dilated pupils. (*Id.*). Dr. Walters discontinued Plaintiff's Kadian and Percocet prescriptions and instructed Plaintiff to continue taking Paxil. (*Id.*).

On May 15, 2008, Plaintiff visited Dr. Walters with complaints of depression. (Tr. 376). Plaintiff reported that he had stopped taking Paxil, and felt that he could "flip at any point" and harm others. (*Id.*). Dr. Walters instructed Plaintiff to restart Paxil, diagnosed Plaintiff with severe depression, and referred him to a psychiatrist. (*Id.*).

On June 4, 2008, Plaintiff informed Dr. Walters that he had not slept for the past two days. (*Id.*). Dr. Walters diagnosed Plaintiff with "insomnia, possibly mania," and prescribed Seroquel. (*Id.*). A CT scan of Plaintiff's head was normal. (Tr. 326).

On June 10, 2008, Omar Qureshi, M.D. conducted diagnostic imaging on Plaintiff after Plaintiff "passed out." (Tr. 325). Dr. Qureshi found that Plaintiff had atelectasis of the right lung base, borderline heart size, and mild degenerative changes in the upper thoracic spine. (*Id.*).

Plaintiff treated with Dr. Walters on June 27, 2008. (Tr. 375). Dr. Walters examined Plaintiff and noted that Plaintiff was "unable to sit comfortably in the upright position. He has to recline on the chair. After about 15 minutes, he needed to stand to reposition for sake of back comfort." (*Id.*). Following this examination, Dr. Walters completed a medical source statement, in which he opined that Plaintiff had the following limitations: he could occasionally lift and carry 10 pounds and frequently lift less than 10 pounds; he could stand/walk for two hours in an 8–hour day; he needed to periodically alternate between sitting and standing to relieve pain and discomfort; he could never climb, balance, or stoop; he could occasionally kneel, crouch, or crawl; he could occasionally reach; and he was limited with respect to hazards. (Tr. 434–37). Dr. Walters indicated that Plaintiffs back pain would limit his ability to stand or sit without repositioning, due to the fact that the longer Plaintiff sat in one position, his muscles spasmed and his pain progressed. (Tr. 435). Dr. Walters opined that "overhead reaching stresses [Plaintiff's] lumbar and thoracic spine where he has degenerative changes, worsening his pain." (Tr. 436). Dr. Walters also opined that Plaintiff's "seizure risk makes hazardous jobs extremely dangerous for him." (Tr. 437).

On July 2, 2008, Plaintiff visited Dr. Miller. (Tr. 438). Plaintiff stated that he was compliant with his medications, but had a seizure on June 11, 2008. (Tr. 438–39). Dr. Miller noted that Plaintiff was on a low dose of Keppra in addition to Depakote, but indicated that the Keppra could worsen Plaintiff's depression, so she instead prescribed Lamictal. (Tr. 438). Dr. Miller opined: "Right now, I think that [Plaintiff] is disabled from working due to his depression as well as his poor seizure control." (Tr. 439). Dr. Miller diagnosed Plaintiff with primary generalized epilepsy with incomplete control. (*Id.*).

At a follow-up appointment with Dr. Miller on August 27, 2008, a neurological examination showed that Plaintiff was alert, and his cranial nerves were normal, although Plaintiff was depressed. (Tr. 429).

On December 8, 2008, Plaintiff treated with Anthony Maroldo, M.D., at University of Rochester Medical Center. (Tr. 288). Dr. Maroldo found that Plaintiff had "a very depressed affect and at times is fearful." (*Id.*). Plaintiff reported having a seizure while driving a boat on June 11, 2009. (*Id.*). Plaintiff also reported poor energy, memory changes, sinus headaches, dyspnea on exertion, shortness of breath, back pain, joint stiffness, and difficulty sleeping. (*Id.*). Dr. Maroldo diagnosed Plaintiff with idiopathic generalized epilepsy with generalized tonic-clonic seizures. (Tr. 289).

On May 13, 2009, Dr. Maroldo filled out a form indicating that Plaintiff could drive because he had not had a seizure in one year. (Tr. 286).

Plaintiff treated with Bernard P. Sweeney, M.D. on November 5, 2009, and had driven himself to his appointment. (Tr. 370). Plaintiff's neurological examination was normal, his cranial nerves were normal, and Plaintiff had no motor, sensory, reflex, or coordination deficits. (Tr. 284).

Plaintiff treated with Dr. Maroldo on April 7, 2010. (Tr. 404). Plaintiff reported having a seizure the prior week despite taking his seizure medication as prescribed. (*Id.*). Dr. Maroldo restarted Plaintiff on Depakote in addition to Lamictal. (*Id.*).

On November 11, 2010, Dr. Maroldo noted that Plaintiff had "idiopathic generalized epilepsy" that was "well controlled" on his name brand medications. (Tr. 280).

On December 28, 2010, Plaintiff treated with Dr. Sweeney, who diagnosed Plaintiff with bipolar disorder and prescribed Seroquel (Tr. 347).

On April 5, 2011, Sandra Jensen, Ph.D., conducted a psychiatric consultative examination on Plaintiff. (Tr. 469). Dr. Jensen found that Plaintiff had a flat affect and that his attention and concentration "appeared to be mildly impaired for unknown reasons. He was able to do one-step, but not two-step calculations. He had some troubles staying on tasks doing serial 3 subtractions...." (Tr. 470–71). Dr. Jensen reported that Plaintiff could do all activities of daily living without difficulty and engaged in hobbies, including fishing, hunting, and trapping. (Tr. 471). Plaintiff watched television, listened to the radio, went out to dinner, and socialized with friends. (*Id.*). Dr. Jensen opined that Plaintiff could follow and understand simple directions and instructions, perform simple tasks independently, maintain attention and concentration, maintain a regular schedule, learn new tasks, perform complex tasks independently, make appropriate decisions, relate adequately with others, and appropriately deal with stress without difficulty. (Tr. 471–72).

On April 5, 2011, Karl Eurenius, M.D., conducted a consultative internal medicine examination. (Tr. 474). Dr. Eurenius noted that Plaintiff could only squat one

quarter of the way due to pain in his low-to-mid back. (Tr. 476). Plaintiff's lumbar spine demonstrated flexion limited to 40 degrees with pain in the low-to-mid back and tenderness just to the left of the L4 and L5 discs. (*Id.*). Plaintiff's straight leg raise test caused pain in the left SI joint and back on the left side. (*Id.*). Dr. Eurenius noted chronic swelling in both of Plaintiff's knees. (*Id.*). Dr. Eurenius diagnosed Plaintiff with "chronic low back pain with a diagnosis of inflamed sacroiliac joint on the left," osteoarthritis of the knees, and a seizure disorder. (Tr. 477). He opined that Plaintiff "is limited in activities during which a seizure might injure himself or others. He is also limited in climbing or descending more than four or five stairs. He is limited in prolonged sitting, prolonged standing, bending, lifting, or carrying due to chronic low back pain." (Tr. 477).

On April 11, 2011, Plaintiff treated with Chen M. Livingston, RPA–C, for lower back pain. (Tr. 588). Physician Assistant Livingston found Plaintiff had lumbar parapinal soft tissue tenderness and spasm on the left with pain on palpation. (*Id.*).

On April 25, 2011, Dr. Butensky, a state agency psychologist, reviewed the medical evidence and found that Plaintiff did not have a severe mental impairment. (Tr. 478). Dr. Butensky found no more than mild limitations in activities of daily living, maintaining social functioning, or maintaining concentration, persistence, or pace. (Tr. 488). Dr. Butensky assessed that Plaintiff's psychiatric impairment was not severe. (Tr. 490).

On October 11, 2011, Plaintiff treated with Jennifer A. Fleeman, Psy.D. at the referral of Dr. Sweeney. (Tr. 500). Plaintiff reported increased difficulty remembering what people told him and following through with tasks since his seizure in 2006. (*Id.*). Dr. Fleeman noted that Plaintiff's performance on attention and information processing tasks was in the borderline impaired range on tasks measuring auditory attention, working memory, and sequencing. (Tr. 501). Plaintiff's performance was low average to borderline impaired on processing speed tasks. (*Id.*). Plaintiff's performance on an auditory memory task was in the impaired range. (*Id.*). After a 20 minute delay, Plaintiff could recall 3 out of 12 words, placing Plaintiff in the impaired range for delayed recall performance. (Tr. 502). After additional tests, Plaintiff's memory recognition was found to be in the impaired range. (*Id.*). Plaintiff's language was borderline impaired. (*Id.*). Dr. Fleeman found that Plaintiff had cognitive impairments in connection with his epilepsy diagnosis, "although there may also be a minor contribution from his mood disorder and insomnia." (Tr. 503). Dr. Fleeman opined "[g]iven his current cognitive impairments, it is likely that [Plaintiff] would continue to experience functional difficulties if he were to return to work at this time." (Tr. 504).

On October 12, 2011, Dr. Sweeney noted that Plaintiff's neurological examination was normal, but Plaintiff's concentration was poor. (Tr. 527).

On November 1, 2011, Plaintiff complained of bilateral knee pain. (Tr. 546). X-rays of Plaintiff's knees showed "mild lateral right patellofemoral joint space narrowing, and an MRI of Plaintiff's knee revealed a small vertical tear in the meniscus in the left knee, as well as mild degenerative changes of the lateral patellar facet cartilage in the right knee." (Tr. 540–41, 544).

Plaintiff treated with Dr. Sweeney on March 6, 2012. (Tr. 531). Dr. Sweeney noted that Plaintiff's knees had effusion bilaterally. (*Id.*). Dr. Sweeney noted that Plaintiff had "poor short-term memory."

(*Id.*). He diagnosed Plaintiff with epilepsy and chronic pain syndrome. (*Id.*).

Dr. Maroldo completed a seizure questionnaire on March 17, 2012. (Tr. 606). Dr. Maroldo noted that Plaintiff's last seizure was on April 3, 2010, and that Plaintiff's seizure disorder was well-controlled with Depakote and Lamictal. (Tr. 606–07). Dr. Maroldo opined that Plaintiff could work at heights, could work with power machines, could operate a motor vehicle, and would not require more supervision than other workers. (Tr. 608). Dr. Maroldo further opined that Plaintiff could handle moderate stress but did have depression, social isolation, a short attention span, and memory problems. (*Id.*).

**D. Determining Disability Under the Social Security Act and the ALJ's Decision**

■ The Social Security Act provides that a claimant will be deemed to be disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which ... has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A); *see Rembert v. Colvin*, No. 13–CV–638A, 2014 WL 950141, at *6 (W.D.N.Y. Mar. 11, 2014). A disabling impairment is defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostics techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D). The burden is on the claimant to demonstrate that he is disabled within the meaning of the Act. *See Draegert v. Barnhart*, 311 F.3d 468, 472 (2d Cir.2002). The individual will only be declared disabled if his impairment is of such severity that he is unable to do his previous work and cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful activity. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

In making the disability determination, the ALJ follows a five-step sequential analysis. If the ALJ makes a determination at any step, the evaluation will not continue to the next step. 20 C.F.R. § 416.920(a)(4). The following five steps are followed:

1. The Commissioner considers whether the claimant is currently engaged in substantial gainful activity.

2. If not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical ability to do basic work activities.

3. If the claimant has a "severe impairment," the Commissioner must ask whether, based solely on medical evidence, the claimant has an impairment listed in Appendix 1 of the regulations. If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocational factors such as age, education, and work experience.

4. If the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work.

5. If the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could perform. The Commissioner bears the burden of proof on this last step, while the claimant has the burden on the first four steps.

*Shaw v. Chater*, 221 F.3d 126, 132 (2d Cir.2000); *see* 20 C.F.R. §§ 404.1520, 416.920.

Here, in applying the five-step sequential evaluation, ALJ Costello made the following determinations. At the first step, the ALJ found that Plaintiff had not engaged in substantial gainful activity since January 19, 2011, the date of his application. (Tr. 12). At the second step, the ALJ found that Plaintiff has the following severe impairments: history of seizure disorder, depression, and back pain. (*Id.*). The ALJ also noted that Plaintiff complained of elbow and knee pain but admitted that his doctors had found no knee impairment or reason for his complaints. (*Id.*). At the third step, the ALJ analyzed the medical evidence and found that Plaintiff did not have a listed impairment or combination of impairments that would render him disabled. (Tr. 12–13). Accordingly, at the fourth step, the ALJ determined Plaintiff's residual functional capacity to perform work. (Tr. 14–16). The ALJ concluded that plaintiff had the following RFC:

> [t]o perform less than the full range of light work as defined in 20 CFR 416.967(b). He should avoid working around heavy machinery and at heights. He should not drive motor vehicles. He can understand, remember and perform simple tasks.

(Tr. 14).

The ALJ then proceeded to the fifth step, which is comprised of two parts. First, the ALJ assessed Plaintiff's job qualifications by considering his physical ability, age, and education. (Tr. 16). At the time the application was filed, Plaintiff was 39 years old, he had a high school education, and his past relevant work was not an issue because it was unskilled work. (*Id.*). Second, the ALJ determined whether there were jobs existing in the national economy that a person with Plaintiff's qualifications and RFC could perform. (Tr. 16–17). ALJ Costello found that Plaintiff's ability to perform work at all exertional levels was compromised by Plaintiff's nonexertional limitations, but, based on the VE's testimony, the ALJ found that Plaintiff was still able to work. (Tr. 17). Relying on the VE's testimony, the ALJ concluded that Plaintiff was able to perform the representative jobs of cafeteria attendant or collator operator, as jobs existing in the national economy. (*Id.*).

## III. DISCUSSION

### A. Standard of Review

■ This Court has jurisdiction to review the final decision of the Commissioner under 42 U.S.C. §§ 405(g) and 1383(c)(3). "In reviewing a decision of the Commissioner, the Court may 'enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner ... with or without remanding the cause for a rehearing.'" *Emerson v. Comm'r of Soc. Sec.*, No. 12 Civ. 6451(PAC)(SN), 2014 WL 1265918, at *9 (S.D.N.Y. Mar. 27, 2014) (quoting 42 U.S.C. § 405(g)). 42 U.S.C. § 405(g) directs the Court to accept findings of fact made by the Commissioner, so long as the findings are supported by substantial evidence in the record. Substantial evidence is "more than a mere scintilla," and "relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938). "Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have [his] disability determination made according to

the correct legal principles." *Johnson v. Bowen,* 817 F.2d 983, 986 (2d Cir.1987).

Therefore, the scope of the Court's review is limited to determining whether the Commissioner applied the appropriate legal standards in evaluating the plaintiff's claim, and whether the Commissioner's findings were supported by substantial evidence in the record. *See Mongeur v. Heckler,* 722 F.2d 1033, 1038 (2d Cir.1983) (stating that a reviewing Court does not examine a benefits case *de novo* ). If the Court finds no legal error, and that there is substantial evidence for the Commissioner's determination, the decision must be upheld, even if there is also substantial evidence for the plaintiff's position. *See Perez v. Chater,* 77 F.3d 41, 46–47 (2d Cir.1996).

■ Judgment on the pleadings may be granted under Rule 12(c) where the "material facts are undisputed and where judgment on the merits is possible merely by considering the contents of the pleadings." *Sellers v. M.C. Floor Crafters, Inc.,* 842 F.2d 639, 642 (2d Cir.1988).

## B. Treating Physician Rule

Plaintiff argues that the ALJ's RFC is not supported by substantial evidence because the ALJ did not properly articulate his rationale for crediting Dr. Maroldo over Dr. Fleeman and also did not analyze or discuss the opinion of treating physician Dr. Walters. (Dkt. 8 at 16).

■ Treating physicians "may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations...." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). The "treating physician rule" requires the ALJ to give "controlling weight" to the opinion of a claimant's treating physician regard-

ing "the nature and severity of [the claimant's] impairment(s) ... [if it] is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). As explained by the Second Circuit Court of Appeals:

> An ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must consider various "factors" to determine how much weight to give to the opinion. 20 C.F.R. § 404.1527(d)(2). Among those factors are: (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion.

*Halloran v. Barnhart,* 362 F.3d 28, 32 (2d Cir.2004). An ALJ does not have to explicitly walk through these factors, so long as the Court can "conclude that the ALJ applied the substance of the treating physician rule ... and provide[d] 'good reasons' for the weight she gives to the treating source's opinion." *Id.*

### 1. Dr. Walters

■ Plaintiff argues that the ALJ erred by failing to weigh, discuss, or evaluate the opinion of Plaintiff's treating physician Dr. Walters that Plaintiff was disabled and unable to work. (Dkt. 8 at 20 (citing Tr. 434–37)). Plaintiff contends that this error was particularly harmful because Dr. Walters' opinion that Plaintiff was limited to sedentary work and could not stoop would render Plaintiff disabled. (*Id.* at 21; Dkt. 11 at 7 (quoting SSR 96–9p, 1996 WL

374185, at \*8 (July 2, 1996)) ("[A] *complete* inability to stoop would significantly erode the unskilled sedentary occupation base and a finding that the individual is disabled would usually apply. . . .")). Dr. Walters also opined that Plaintiff's seizure disorder would prevent him from being able to work. (Tr. 441) ("I believe [Plaintiff's] combination of chronic low back pain with degenerative disk disease and his seizure disorder makes it impractical for him to find and maintain employment.").

The Commissioner acknowledges that the ALJ did not expressly weigh Dr. Walters' opinion, but argues that this omission from the decision does not mean that the ALJ did not consider the opinion, and further presents a number of arguments for why the ALJ was not required to directly address Dr. Walters' opinion. (Dkt. 10–1 at 26 (citing *Brault v. Soc. Sec. Admin. Comm'r*, 683 F.3d 443, 448 (2d Cir.2012))).

■ "[T]he ALJ cannot ignore the medical evidence provided by a treating physician." *Pagan ex rel. Pagan v. Chater*, 923 F.Supp. 547, 556 (S.D.N.Y.1996). "The medical conclusions of a treating physician constitute[ ] evidence that should not be rejected without explanation." *Id.* It was clear legal error for the ALJ to not even mention Dr. Walters in the context of his opinion when Dr. Walters was Plaintiff's treating physician and the administrative record is full of treatment notes from Dr. Walters. (*See, e.g.*, Tr. 326, 375–78, 38–81, 383–85, 392, 394, 397, 399, 400, 434–37). If the ALJ felt that the opinions were not of value or were in some way not supported by the medical evidence of record, then the ALJ should have explained those conclusions. "The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases, even—and perhaps especially—when those disposi-

tions are unfavorable." *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir.1999).

"Under such circumstances, courts 'do not hesitate to remand when the Commissioner has not provided "good reasons" for the weight given to a treating physician's opinion . . . ,' and should continue to order remand when they 'encounter opinions from ALJ's [sic] that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion.'" *Smith v. Colvin*, 17 F.Supp.3d 260, 269 (W.D.N.Y.2014) (quoting *Halloran*, 362 F.3d at 33); *see also Dunker v. Astrue*, No. 11–CV–321A, 2014 WL 297100, at \*9 (W.D.N.Y. Jan. 27, 2014) (remanding where ALJ failed to acknowledge the treating source's opinion at all); *Austin v. Colvin*, No. 12–CV–1470 (NGG), 2013 WL 4077884, at \*10–11 (E.D.N.Y. Aug. 12, 2013) (remanding where ALJ failed to provide reasons for "placing zero weight" on the opinions of treating sources).

Accordingly, this case is remanded for reconsideration of Dr. Walters' opinions related to Plaintiff's functional limitations (Tr. 375, 441), and for a written explanation as to any basis for not according the opinions "controlling weight."

### 2. Dr. Fleeman

■ The ALJ also found that "[i]n terms of degree of severity, [Dr. Fleeman's] findings [with respect to Plaintiff's memory and attention difficulties] are somewhat inconsistent with those of Dr. Maroldo, who is the [Plaintiff's] treating neurologist." (Tr. 15). Accordingly, the ALJ assigned Dr. Maroldo's opinion "greater weight" as Plaintiff's treating physician. (*Id.*).

Plaintiff contends that the ALJ improperly discredited Dr. Fleeman's opinion in favor of Dr. Maroldo's opinion when "Dr. Fleeman, a neuropsychologist, examined the mental effects of Plaintiff's epilepsy whereas Dr. Maroldo never completed any

testing regarding the impact Plaintiff's epilepsy had on his cognitive functioning." (Dkt. 8 at 17). Plaintiff suggests that the ALJ should have contacted Dr. Fleeman to further develop the record with respect to Plaintiff's cognitive limitations. (*Id.*).

The Commissioner claims that Dr. Fleeman was a consultative physician, "whose opinion was not due any special weight under the Commissioner's regulations." (Dkt. 10–1 at 24). The Commissioner argues that "it is clear" that the ALJ afforded more weight to Dr. Maroldo's opinion because Dr. Maroldo's treatment relationship with Plaintiff was "greater in length, frequency, nature, and extent than Dr. Fleeman's." (*Id.*).

The ALJ largely relied on Dr. Maroldo's conclusion that Plaintiff's seizure disorder was well controlled on Depakote to find that Plaintiff did not have the extreme memory loss alleged. (Tr. 16). By contrast, the ALJ noted that Dr. Fleeman, on testing, found memory and attention difficulties. (Tr. 15). Because the ALJ detected an inconsistency in these opinions, he assigned Dr. Maroldo's opinion greater weight as Plaintiff's treating physician, and discredited Dr. Fleeman's opinion.

However, Plaintiff is correct to note that the ALJ improperly compared these opinions. Dr. Maroldo did not consider the impact of Plaintiff's prior seizures on his cognitive functioning, nor did he complete any testing to examine Plaintiff's cognitive functioning. The fact that Plaintiff's seizures were controlled on medication did not mean that Plaintiff did not have lasting cognitive effects from his prior seizures. By contrast, Dr. Fleeman performed complete testing to target Plaintiffs cognitive functioning, and detected impairments that she opined would impact Plaintiff's ability to function in the workplace. (Tr. 504). These findings are supported by Dr. Jensen's observation on testing that Plaintiff

was able to do one-step, but not two-step calculations and had trouble staying on task doing serial 3 subtractions. (Tr. 470–71).

Dr. Fleeman recommended that Plaintiff use strategies such as accepting reminders from others for appointments and asking others to repeat important information that he needed to remember to cope with his impairments. (Tr. 505). Notably, the VE opined that an individual who needed to be reminded of tasks approximately once per hour could not maintain employment. (Tr. 48).

█ "Although the treating physician rule generally requires deference to the medical opinion of a claimant's treating physician, ... the opinion of the treating physician is not afforded controlling weight where ... the treating physician issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts." *Halloran*, 362 F.3d at 32. Here, the opinions of Dr. Fleeman and Dr. Maroldo are not comparable. The ALJ erred by rejecting Dr. Fleeman's opinion in favor of Dr. Maroldo's opinion. Accordingly, the Commissioner is directed to reevaluate and discuss the weight assigned to the opinion of Dr. Fleeman on remand.

### C. Credibility

Plaintiff argues that the ALJ's credibility analysis was unsupported by substantial evidence. (Dkt. 8 at 22).

█ The Social Security regulations require a two-step process for the ALJ to consider the extent to which subjective evidence of symptoms can reasonably be accepted as consistent with the medical and other objective evidence. *Brownell v. Comm'r of Soc. Sec.*, No. 1:05–CV–0588 (NPM/VEB), 2009 WL 5214948, at *3 (N.D.N.Y. Dec. 28, 2009). First, the ALJ

considers whether the medical evidence shows any impairment "which could reasonably be expected to produce the pain or other symptoms alleged...." 20 C.F.R. § 404.1529(a). Second, if an impairment is shown, the ALJ must evaluate the "intensity, persistence, or functionally limiting effects" of a claimant's symptoms to determine the extent to which they limit the claimant's capacity to work. 20 C.F.R. § 404.1529(b). When the objective medical evidence alone does not substantiate the claimant's alleged symptoms, the ALJ must assess the credibility of the claimant's statements considering the details of the case record as a whole. 20 C.F.R. §§ 404.1529(c)(3)(i)-(vii).

In the instant case, the ALJ properly applied the two step analysis. First, the ALJ found that Plaintiff's medically determinable impairments could be expected to cause the alleged symptoms. (Tr. 14). Second, the ALJ determined that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the ... residual functional capacity assessment." (*Id.*).

In evaluating a Plaintiff's credibility, the ALJ must consider several factors, including:

1. The individual's daily activities;

2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;

3. Factors that precipitate and aggravate the symptoms;

4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g. lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Stewart v. Barnhart,* 235 F.R.D. 579, 590 (W.D.N.Y.2006); *see* 20 C.F.R. § 404.1529(c).

Although the ALJ properly applied the two-step analysis, his consideration of these factors may be impacted on remand in light of the weight assigned to Drs. Fleeman and Walters.

For example, Plaintiff argues that the ALJ improperly stated that there was "nothing in the record that supports the degree of memory loss Plaintiff alleges." (Tr. 14). Plaintiff points to medical records of his performance on auditory memory and memory recognition tasks. (Dkt. 8 at 22 (citing Tr. 501–02)). The Commissioner notes that Plaintiff appeared at the hearing to be incapable of answering simple questions about himself, and yet Dr. Maroldo did not find that Plaintiff had such memory restrictions. (Dkt. 10–1 at 29 (citing Tr. 501)). The Commissioner further notes that Dr. Jensen found that Plaintiff had no difficulties with recent or remote memory. (*Id.* (citing Tr. 471–72)). This rejection of Plaintiff's credibility with respect to memory loss associated with his seizures is directly related to the ALJ's consideration of the opinion of Dr. Fleeman, who determined upon testing that Plaintiff would likely have difficulty functioning in the workplace as a result of his cognitive impairments tied to his seizures. Accordingly, the ALJ's credibility analysis may be impacted on remand if different

weight is assigned to Dr. Fleeman's opinion.

Plaintiff also contends that the ALJ improperly stated that Plaintiff could perform all activities of daily living because the record indicated "numerous instances where Plaintiff cannot drive due to seizures" as well as Plaintiff's own testimony that he had difficulty comprehending what he was reading. (Dkt. 8 at 23 (citing Tr. 43, 241, 289, 441)). These considerations may be impacted on remand by the weight assigned to Dr. Walters' opinion that Plaintiff could not drive (Tr. 441), and Dr. Fleeman's opinion that Plaintiff had impaired comprehension skills (Tr. 501–02).

The Court cannot conclude that the ALJ committed a legal error in conducting his credibility analysis of Plaintiff's testimony. However, the Commissioner may discover on remand that the current RFC should be revised due to the weight assigned to the opinions of Dr. Fleeman or Dr. Walters. As a result, the Commissioner is directed to reevaluate the credibility of Plaintiff's claims in light of the weight assigned to the medical evidence on remand.

### D. Step 5 Determination

Plaintiff argues that the ALJ's step 5 determination that there were jobs existing in the national economy for Plaintiff to perform was unsupported by substantial evidence because he came to that conclusion by relying on the testimony of the VE, which was based upon an incomplete and unsupported hypothetical question. (Dkt. 8 at 23). The Commissioner argues that Plaintiff would be able to perform the same representative jobs identified by the VE and ALJ even if the ALJ had incorporated Dr. Walters' restriction of allowing Plaintiff to sit and stand at will. (Dkt. 10–1 at 31).

Where a VE is presented with a hypothetical question that incorporates an RFC that is unsupported by substantial evidence, that VE testimony cannot serve as substantial evidence to support an ALJ's determination. *De Leon v. Sec'y of Health & Human Servs.,* 734 F.2d 930, 934 (2d Cir.1984). As a result, the ALJ's reliance on the VE to find that there are jobs in the national economy for Plaintiff to perform was made in error. On remand, the Commissioner must re-evaluate whether there are jobs in the national economy for Plaintiff to perform.

## IV. CONCLUSION

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings (Dkt. 10) is denied, Plaintiff's motion for judgment on the pleadings (Dkt. 7) is granted in part, and this matter is remanded for further administrative proceedings consistent with this Decision and Order.

SO ORDERED.